UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| M.A.C., by next friend, M.E.C., SCARLET BURK, by next friend, Felicia Burk; BINTA BARROW, by next friend Sadiatou Ashford; JAY BRYANT, by next friend, Drama Bryant; AMANDA CASEY, by next friend, Ronda Coggins;<br><br>      Plaintiffs,<br><br>v.<br><br>STEPHEN SMITH, in his official capacities as Deputy Commissioner of the Tennessee Department of Finance and Administration and Director of TennCare; and the TENNESSEE DEPARTMENT OF FINANCE AND ADMINISTRATION,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 3:21-cv-509 |

**MEMORANDUM OPINION**

This is a disability discrimination case brought by five intellectually or physically disabled individuals who require around-the-clock care. Defendants, the Tennessee Department of Finance and Administration ("TDFA"), along with its Deputy Commissioner and the Director of TennCare, Stephen Smith, have filed a Motion to Dismiss for Failure to State a Claim and Lack of Jurisdiction (Doc. No. 28). Having considered the arguments raised in the considerable briefing (Doc. Nos. 28-1, 29, 31) the Court will grant in part and deny in part Defendants' Motion.

**I. Factual Allegations and Background**

The Complaint is almost 38 pages long and contains 174 paragraphs, not counting the prayer for relief. For the most part, the relevant facts do not appear to be in dispute, only a handful of which

are necessary to place the parties' arguments in context.

Plaintiffs range in age from 17 to 41 years old, and each has a severe medical and/or intellectual disability requiring twenty-four hour a day care. That care is provided through the Medicaid Program via TennCare, and by family members. Each Plaintiff has an independent support plan ("ISP") and an independent support coordinator ("ISC") who try to find providers that can meet their specific needs. (Doc. No. 29 at 2).

TennCare provides three categories of services to citizens in this state. The first is basic Medicaid services, which is provided through private Managed Care Organizations ("MCOs"). The second is medically necessary early and periodic screening, diagnostics and treatment ("EPSDT") for those under 21 years old. This, too, is provided by MCOs and covers two of the Plaintiffs in this case. The third, and the one most relevant here, is through waivers from the Centers for Medicare & Medicaid Services ("CMS") that allow states to provide Home and Community Based Services ("HCBS") to individuals who would otherwise receive medical care in an institutional setting, so long as the overall cost is lower. These waivers are administered by the Tennessee Department of Intellectual and Developmental Disabilities and are known as "DIDD Waivers." (Doc. No. 28-1 at 2-3).

Plaintiffs allege that, even though Tennessee recognizes they require extensive care "including personal attendant (PA) services to enable them to live safely at home," it has failed to provide the necessary and required "in-home" care required to meet their needs. This has resulted in gaps in care and has caused "preventable suffering, harm to their health and [a] heightened risk of involuntary institutionalization, all in violation of the federal Medicaid Act and its implementing regulations." (Doc. No. 1, Compl. ¶ 2).

With respect to all of the Plaintiffs, the essence of their complaint is as follows:

> The State's chronic failure to meet the Plaintiffs' care needs is due to the State's longstanding insistence on paying lower rates for home care services, including PA services, for people in the DIDD Waiver than TennCare pays for identical services provided to all other TennCare enrollees. The policy has deterred agencies from contracting with TennCare, resulting in a provider network that is grossly inadequate to meet the needs of many DIDD Waiver participants like the Plaintiffs. The State recently improved DIDD'S rates for PA services, but left rates for other DIDD providers well below the rates that the State pays for the care of all other TennCare enrollees. As a result, agencies remain unwilling to contract with DIDD, and the DIDD Waiver remains incapable of meeting the Plaintiffs' needs for PA services. The State's policy discriminates against the Plaintiffs on the basis of their intellectual disabilities in violation of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. The State also violates the ADA by offering the Plaintiffs the care they need in an institutional setting, while withholding care in a home and community-based setting, in defiance of the ADA's requirement that services be provided in the most integrated setting appropriate to the individual's needs.

(Id. ¶ 3). In addition, Plaintiffs M.A.C. and Burk allege that they have not received the medically necessary EPSDT services that they are entitled to as minors. (Id. ¶ 5). Finally, Plaintiffs allege that "[t]he State has compounded the harm . . . by denying them the opportunity to appeal and receive a fair hearing to remedy the wrongful denial of necessary health services." Id. ¶ 4).

The Complaint contains nine causes of action. Plaintiffs claim that the practices about which they complain violate the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## II. Legal Discussion

As a preliminary matter, the Court agrees with Plaintiffs that many of the arguments and grounds Defendants raise are simply not appropriate for resolution at the Motion to Dismiss stage. In doing so, the Court recognizes Defendants' counter-argument that "aside from statutes and case

law, [they] referenced two documents," one (a State Medicaid Director Letter) "to rebut Plaintiffs' misplaced reliance on it," and the other (a HCBS waiver application and approval) that were "'referred to' in Plaintiffs' Complaint or are public records 'central to [Plaintiffs'] claims[.]'" (Doc. No. 31 at 1-2) (citation omitted). Maybe so, but Defendants' brief is replete with other instances where they assume facts in evidence, even though they have not been established as of yet. Chief among them is Defendants' assertion that Plaintiffs' allegation that staffing shortages are due to the low rates paid by the state is "untethered from reality" because "[t]here is a long-standing, nationwide labor crisis for direct-support professionals that has been exacerbated by the COVID-19 pandemic." (Doc. No. 28-1 at 2).

In an effort to address this problem, Defendants have filed a "Request for Judicial Notice" in which they ask that "the Court take judicial notice of [eleven] appended exhibits in connection with their contemporaneously filed Motion to Dismiss." (Doc. No. 27 at 1). They claim that "these documents are 'not subject to reasonable dispute.'" (Id. at 2).

A court may take judicial notice of "a fact that is not subject to reasonable dispute," either because such a fact "is generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This is "a shortcut around" the general rule that "parties must normally submit admissible evidence to support the factual allegations in their case." Abu-Joudeh v. Schneider, 954 F.3d 842, 848 (6th Cir. 2020). However, "courts do not take judicial notice of documents, they take judicial notice of facts." Id.

In this case, "it is not the existence of these documents that [Defendants] seek [this Court] to acknowledge; rather, [they] seek to rely on the substantive facts within those exhibits[.]" Davis v. City of Clarksville, 492 F. App'x 572, 578 (6th Cir. 2012). This is not permitted by Rule 201

4

because that rule is not a vehicle for proving facts that may be disputed. See Abu-Joudeh, 954 F.3d at 848 (stating that "the existence of a document could be . . . a fact" for purposes of Rule 201, but a court cannot then "take judicial notice of the document for the truth of the matters they assert"); Downing v. Ford Motor Co., No. 18-1335, 2018 WL 4621955, at *1 (6th Cir. Sept. 24, 2018) (stating that "judicial notice is only proper where the fact is adjudicative, relevant, and beyond reasonable controversy").

To compound matters, Plaintiffs have attached six of their own exhibits to their response brief, including two declarations. One of those declarations is from an ISC who states that, while the COVID-19 pandemic has generally reduced the availability of caregivers, the difficulty in finding agencies willing to provide DIDD waiver services has existed for at least seven years, with the primary reason being low pay. (Doc. No. 29-1, Volker Decl. ¶ 20). Again, this is not something that can be considered at the pleading stage. Instead, "it is black-letter law that, with a few irrelevant exceptions, a court evaluating a motion for judgment on the pleadings (or a motion to dismiss) must focus only on the allegations in the pleadings." Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 483 (6th Cir. 2020).

Under Rule 12, when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and all parties must be given a reasonable opportunity to respond. Fed. R. Civ. P. 12(d). The Sixth Circuit "has interpreted the text of Rule 12(d) to mean that a district court must either (1) expressly reject evidence outside the complaint that is attached to a 12(b)(6) motion or an opposition to such motion, or (2) treat the motion to dismiss as a motion for summary judgment." Courser v. Michigan House of Rep.'s, 831 F. App'x 161, 169 (6th Cir. 2020) (citing Bates v. Green Farms Condo. Ass'n, 958

5

F.3d 470, 484 (6th Cir. 2020)). Whether to convert is a matter of discretion. Wysocki v. Int'l Bus. Mach. Corp., 607 F.3d 1102, 1104 (6th Cir. 2010); Salehpour v. Univ. of Tenn., 159 F.3d 199, 203 (6th Cir.1998).

Here, the Court will exercise its discretion by not relying on matters outside the pleadings and by not converting the pending motion to dismiss to a motion for summary judgment. This is primarily because the matters that have been presented are clearly not all that the parties would rely upon in moving for, or opposing, summary judgment, which is "fundamentally evidence-based." Gen. Drivers, Warehousemen & Helpers, Loc. Union No. 89 v. Clariant Corp., No. 16-6203, 2017 WL 3270772, at *2 (6th Cir. May 17, 2017). Nor does the Court want to decide issues in a vacuum, or address them more than once when it would otherwise be unnecessary. Accordingly, the Court turns to the issues that can be decided in the motion to dismiss context. This will assist the parties going forward, including any discussions about settling their differences that they must in good faith undertake.

**A. Standing**

The threshold question in every federal case is standing. Warth v. Seldin, 422 U.S. 490, 498 (1975). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" under Article III of the United States Constitution. Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).

"[T]he irreducible constitutional minimum of standing contains three elements," Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992), that the plaintiff has the burden of establishing, FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231. Plaintiff "must allege specific, concrete facts," Warth, 422 U.S. at 498, demonstrating that he or she "(1) suffered an injury in fact, (2) that is fairly

6

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561.

Defendants argue that Counts I through VII are subject to dismissal under Rule 12(b)(1) because Plaintiffs cannot meet either the causation or redressability elements of standing. The Court considers the arguments in turn.

**1. Causation**

"A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may involve a facial attack or a factual attack." Am. Telecom Co. v. Republic of Lebanon, 501 F.3d 534, 537 (6th Cir. 2007) (citing Golden v. Gorno Bros., Inc., 410 F.3d 879, 881 (6th Cir.2005)). Defendants assert both lines of attack.

"A facial attack is a challenge to the sufficiency of the pleading itself." United States v. Ritchie, 15 F.3d 592, 598 (6th Cir.1994). "When reviewing a facial attack, a district court takes the allegations in the complaint as true, which is a similar safeguard employed under 12(b)(6) motions to dismiss." Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co., 491 F.3d 320, 330 (6th Cir. 2007). "If those allegations establish federal claims, jurisdiction exists." Id.

"A factual attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." Ritchie, 15 F.3d at 598. "When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction, the district court must weigh the evidence and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter." American Telecom, 501 F.3d at 537.

7

Turning first to Defendants' factual challenge, the Court is at a loss to understand its basis. They claim that "numerous, complex factors contribute to the nationwide shortage of PAs [Personal Attendants]" and that "Plaintiffs cannot prove that TennCare caused their staffing shortages by paying PA providers allegedly 'lower rates' than it pays other providers for purportedly 'identically services.'" (Doc. No. 28 at 13). Even if true, Defendants do not explain why this argument is properly a factual – as opposed to facial – attack on standing. After all, it is undisputed that Plaintiffs are disabled and entitled to benefits furnished through Tenncare, which they claim to not be receiving. This is the essential "case or controversy" before the Court

Factual challenges are of a "unique nature," Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993), "[b]ecause at issue in a factual 12(b)(1) motion is the trial court's jurisdiction – its very power to hear the case[.]" Mortensen v. First Federal Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977). Proper grounds for factual challenges include such things as whether (1) defendant is an employer for purposes of Title VII, see Doe v. Goldstein's Deli, 82 F. App'x 773, 775 (3d Cir. 2003); (2) an employee was acting within the scope of his employment for purposes of the Federal Tort Claims Act, Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990); (3) an attorney had standing under the Foreign Intelligence Surveillance Act, Schuchardt v. President of United States, 802 F. App'x 69, 74 (3d Cir 2020); (4) pallets moved across state lines for purposes of the Interstate Commerce Act, W. Transp. Co. v. Couzens Warehouse & Distributors, Inc., 695 F.2d 1033, 1038 (7th Cir. 1982); and (5) a contractor's claims were preempted under The Contract Disputes Act, RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1135 (6th Cir. 1996). All of those questions go to the power of the Court to hear the case and subject matter jurisdiction. How a disagreement about the reasons for the shortage of care falls into this category is never explained by

8

Defendants.

Facially, Defendants similarly argue that causation is insufficiently pled because "Plaintiffs' staffing shortages cannot be fairly traceable to TennCare's conduct if the 'line of causation' is 'too attenuated.'" (Doc. No. 28 at 12). Instead, Defendants continue, Plaintiff must show that the staffing shortages are traceable to Defendants and not someone or something else. Defendants also argue that Plaintiffs' allegations about the pay differential between DIDD waiver personal assistants and other Tenncare aides are conclusory because, for example, they do not "give a single example of providers refusing to staff Plaintiffs because the provider can get a 'higher rate' for providing 'identical services' to others," nor do "they allege what the actual rate difference is[.]" (Id.).

Defendants' arguments are based upon their narrow reading of the Complaint and their overstatement of what needs to be alleged to survive dismissal at the pleadings stage. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," Warth, 422 U.S. at 501, except where, as already noted, there is a competent factual challenge to jurisdiction.

"To establish causation, a plaintiff must show a 'causal connection between the injury and the conduct complained of,' or, in other words, that the injury alleged is 'fairly . . . trace[able] to the challenged action of the defendant.'" Durham v. Martin, 905 F.3d 432, 434 (6th Cir. 2018) (quoting Lujan, 504 U.S. at 560). "The plaintiff also must show that the alleged injury is not "th[e] result [of] the independent action of some third party not before the court." Id.

The allegations in the Complaint more than satisfy these requirements. For each Plaintiff, paragraphs present factual allegations regarding the care they are entitled to, their efforts to get that

9

care, the denial of that care, and the allegation that the denial of the care because of the inadequacy of the provider network and TennCare's policies. (Doc. No. 1 at 12-28). More generally, the Complaint alleges that ISPs are usually unsuccessful in finding caregivers because the reimbursement rates for services by DIDD providers has historically been lower than rates for similar services provided by MCO providers, which, in turn makes providers less likely to deliver services to a clientele consisting of DIDD enrollees.

Even though the existence of COVID-19, which has become the new reality, and the low rates paid to caregivers nationwide may play a role in the shortage of DIDD providers in Tennessee, "causation need not be proximate" and "the fact that an injury is indirect does not destroy standing as a matter of course." Parsons v. U.S. Dep't of Just., 801 F.3d 701, 713 (6th Cir. 2015). To the contrary, an "indirect 'attenuated line of causation to the eventual injury'" can be "sufficient to satisfy standing requirements at the pleading stage." Id. (quoting United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 (1973)).

In their reply Defendants acknowledge that the Sixth Circuit in Parsons "espouse[d] an indirect causation theory," but go on to note that "[t]he Sixth Circuit has further explained, '[a]n indirect theory of traceability requires that the government cajole, coerce, command." (Doc. No. 31 at 2) (quoting Turaani v. Wray, 988 F.3d 313, 316 (6th Cir. 2021)). Based on Turaani, Defendants argue that "Plaintiffs cannot trace a clear line of causation because they are faced with a multitude of factors contributing to their staffing shortages, none of which involve government coercing, cajoling, or commanding Plaintiffs' staff to miss shifts." Id.

Defendants read too much into the "cajole, coerce, command" phrase in Turanni and divorce it from context. There, the Sixth Circuit observed that "unless the defendant's actions had a

10

'determinative or coercive effect' upon the third party, the claimant's quarrel is with the third party, not the defendant." 988 F.3d at 316. Further, "[c]ourts should not 'presume either to control or to predict' the 'unfettered choices made by independent actors not before the courts,'" and "[a] third party's 'legitimate discretion' breaks the chain of constitutional causation." Id. (citations omitted).

Here, Plaintiffs are essentially asserting that the DIDD waiver providers do not have an "unfettered choice" between providing care to those in that program and those in other TennCare programs that pay more, nor do they have any real discretion considering that it makes sense to get paid more for what Plaintiffs contend is the same work. It is "possible to motivate harmful conduct without giving a direct order to engage in said conduct." Parsons, 801 F.3d at 741. Indeed, "[i]n the nebulous land of 'fairly traceable,' where causation means more than speculative but less than but-for, the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard." Id. Such are the allegations here.

Plaintiffs have established the causation element of standing, both as a factual and facial matter.

### 2. Redressability

Relying upon the plurality opinion in Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320 (2015) and a concurring and dissenting opinion in Waksul v. Washtenaw Cnty. Cmty. Mental Health, 979 F.3d 426, 468 (6th Cir. 2020), Defendants insist that Plaintiff claims "are not judicially redressable." (Doc. No. 28 at 15). This is because the Supreme Court in Armstrong held that Medicaid providers did not have a private right of action to challenge rates under Section 1396(a)(30)(A) of the Medicaid Act, which requires participating states to implement measures that assure "payments [to providers of care] are consistent with efficiency, economy, and quality of care

11

and are sufficient to enlist enough providers." 42 U.S.C. § 1396(a)(30)(A). Instead, rate-setting is for agencies that have expertise in the area, not the courts. Because "Plaintiffs filed this lawsuit wanting to change DIDD's rates," Defendants argue, their Complaint cannot go forward because it is precluded by Armstrong. (Doc. No. 31 at 3).

The Court is unpersuaded by Defendants' arguments for two reasons. First, while Defendants argue that what Plaintiffs really want is to make TennCare raise rates for DIDD waiver providers and they are trying to "disguise" their true intentions (id.), "Plaintiffs are masters of their complaint[.]" Webster v. Reprod. Health Servs., 492 U.S. 490, 512 (1989). Nowhere in the Complaint do Plaintiffs specifically ask for increased wages as a remedy. Instead, in their prayer for relief, Plaintiffs request a declaratory judgment finding that Defendants have violated their rights, and an injunction that would prohibit Defendants (1) "from withholding medically necessary services in violation of the Medicaid Act and Americans with Disabilities Act"; (2) "implementing the unlawful policies complained of herein"; and otherwise (3) denying the Plaintiffs due process of law[.]" (Doc. No. 1, at 39).

Second, Plaintiffs do not challenge Section 1396(a)(30)(A), and Armstrong does not preclude all private Medicaid Act lawsuits, including Sections 1296n(c)(2)(A) and (C), which are the basis for Counts I and II of the Complaint. This is clear from the post-Armstrong majority opinion in Waksul, wherein the Sixth Circuit "adhered" to its earlier "conclusion that §§ 1396n(c)(2)(A) and (C) are enforceable under § 1983," and held there is "a private right of action under both sections." 979 F.3d 426, 448, 454. That Judge Readler may have thought otherwise, or believed conferring individually enforceable rights would be "judicially unadministratable" as set forth in his concurring and dissenting in part opinion, does not change the majority, controlling opinion. Accordingly,

12

Plaintiffs have satisfied the redressability element of standing.

**B. Immunity**

Defendants argue that the TDFA must be dismissed as to "most claims," because, as a state agency, it has Eleventh Amendment immunity. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 (1984) ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). They also argue that the TDFA is entitled to immunity on Counts I, II, VII, VIII, and IX because they are brought under 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332, 345 (1979) (holding that although § 1983 was enacted pursuant to the Fourteenth Amendment, Congress did not "explicitly and by clear language" express its intent to "abrogate the Eleventh Amendment immunity of the States" or its agencies). Finally on the issue of immunity, Defendants argue that TDFA has sovereign immunity on Counts III and V because Plaintiffs effectively allege an equal protection claim under Title II of the ADA. See Popovich v. Cuyahoga Cnty. Court of Common Pleas, 276 F.3d 808, 816 (6th Cir. 2002) (stating that Congress has not abrogated state immunity for purposes of Title II equal protection claims).

To their credit, Plaintiffs concede that dismissal of their Section 1983 claims as to the TDFA is appropriate. They argue, however, that dismissal of Count V is not appropriate because it is a due process – not an equal protection – claim under the Fourteenth Amendment.

In Popovich, in addition to holding that state immunity applied to equal protection claims under the ADA, the Sixth Circuit held that such immunity does not exist when a plaintiff claims a due process violation relating to his or her disability under Title II. 276 F.3d at 813-16; see also, Robinson v. Univ. of Akron Sch. of L., 307 F.3d 409, 412 (6th Cir. 2002) (indicating that Popovich

13

stands for the proposition that "ADA Title II may validly abrogate state sovereign immunity in certain cases where it is used to enforce Due Process rather than Equal Protection guarantees").

Defendants argue that "Count V is a paradigmatic equal protection claim because it sounds in 'discrimination,' and Plaintiffs continue to assert they were denied equal protection 'based upon their disabilities.'" (Doc. No. 31 at 5). However, Count V is a "paradigmatic" example of an equal protection claim only because Defendants read it as such. Count V more clearly sounds in a denial of due process because Plaintiffs specifically allege a violation of the integration clause of the ADA and claim that Defendants did not "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities" as required by 28 C.F.R. § 35.130(d). (Doc. No. 1, Cmpl. ¶ 150). This is akin to the "due process-type claim" in Popovich "that the state court in a child custody proceeding denied the partially deaf plaintiff a reasonable way to participate meaningfully in the proceeding so that he could assert his child custody rights." 276 F.3d at 813.

Accordingly, the Court finds that the TDFA is entitled to immunity under Section 1983 on Counts I, II, VII, VIII and IX, and it will be dismissed from those claims. Of course, this does not preclude Plaintiffs from continuing to pursue prospective relief on those claims against Smith in his official capacity. Jordan, 440 U.S. at 345; Ernst v. Rising, 427 F.3d 351, 358–59 (6th Cir.2005).

**C. Failure to State a Claim Under Rule 12(b)(6)**

In moving to dismiss for failure to state a claim, Defendants take a scatter-shot approach seeking to dismiss all or parts of a specific count in the Complaint. Because many of the arguments are underdeveloped and this case will have to move forward with discovery regardless, the Court finds it unnecessary and a waste of judicial resources to discuss those claims in detail.

14

For example, Defendants argue that Count II, which is brought under 42 U.S.C. § 1396n(c)(2)(C), must be dismissed because Plaintiffs do not "allege (1) any feasible alternative to institutionalization, and (2) that Defendants failed to inform Plaintiffs of this supposed alternative as required by the statute's plain language and Sixth Circuit precedent." (Doc. No. 28-1 at 17). Defendants also argue that Counts III and IV which allege discrimination under the ADA and Section 504 must also be dismissed they cannot show disparate treatment or "sufficiently pled a failure to accommodate." (Id. at 19). They also argue that "Plaintiffs Barrow, Byrant, and Case never requested an accommodation from Defendants," and that "Plaintiffs M.A.C. and Burk did not put Defendants on reasonable notice of their need for an accommodation from Defendants." (Id. at 20).

Defendants assertion that these claims must be dismissed because Plaintiffs did not identify or request an accommodation is nothing short of remarkable. The state has agreed to provide Plaintiffs with in-home care in accordance with each Plaintiffs' ISP and has not done so. That is the reasonable accommodation to which Plaintiffs are entitled. Nothing more need be pled.

Relatedly, Defendants seem to suggest that M.A.C.'s and Burk's ADA and Section 504 claims fail because neither exhausted their administrative remedies. (Doc. No. 28-1 at 20-21). To the extent that is Defendants' argument, it fails because exhaustion is not required under Section 504. Doe v. BlueCross BlueShield of Tennessee, Inc., 926 F.3d 235, 239 (6th Cir. 2019).

Next, Defendants in their reply brief argue that, with respect to Count III, "the Sixth Circuit confirmed just last month that there are only '[t]wo types of claims that are cognizable under Title II: clams for discrimination and claims for a reasonable accommodation' – not disparate impact." (Doc. No. 31 at 5) (quoting Palladeno v. Mohr, No. 20-3587, 2021 WL 4145579, at *4 (6th Cir. Sept. 13, 2021)). This is true, but irrelevant:

15

> Plaintiff's complaint contains only one ADA "discrimination" claim, and Sixth Circuit case law does not wholly support the presumption that each legal theory of liability can or should be viewed as a separate claim under Title II. Indeed, the Sixth Circuit has not defined whether, or to what extent, a plaintiff is required to further identify the legal theories under which he proceeds, once he has included sufficient allegations to state a claim of intentional discrimination under Title II.

Saqr v. Univ. of Cincinnati, No. 1:18-CV-542, 2019 WL 699347, at *3 (S.D. Ohio Feb. 20, 2019). Count III is captioned as an "unlawful discrimination" claim under the ADA, and can be viewed as such when construed in Plaintiffs' favor as required by Rule 12(b)(6).

Finally, Defendants argue that Plaintiffs M.A.C. and Burk are not entitled to PA care under EPSDT as alleged in Count VII because PA services are not required under that program. They further argue that Plaintiffs have failed to state a plausible due process claim as alleged in Counts VIII and IX because "there are no appeal rights for missed shifts of a benefit TennCare has approved and has agreed to pay for." (Doc. No. 28-1 at 22). Neither argument is susceptible to summary dismissal on the pleadings. As to the former, the Court has no way of knowing as a fact whether the services M.A.C. and Burk need include personal care services that are covered, or should be covered by TennCare. As to the latter, the Court cannot say that Plaintiffs' claims can be simply boiled down to a dispute about a missed shift here or there.

### III. CONCLUSION

Based upon the foregoing, Defendants' Motion to Dismiss (Doc. No. 28) will be granted solely with respect Counts I, II, VII, VIII and IX as to the TDFA, but in all other respects will be denied. Those claims remain pending against Smith in his official capacity for prospective relief.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE