# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| M.A.C., by next friend, M.E.C., et. al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-00509 |
| | ) | Judge Crenshaw |
| STEPHEN SMITH, et. al., | ) | Magistrate Judge Frensley |
| | ) | |
|     Defendants. | ) | |

---

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR ATTORNEYS' FEES AND COSTS

---

**JONATHAN SKRMETTI**
**Attorney General and Reporter**

**Meredith W. Bowen**
**Senior Assistant General**

**Matthew P. Dykstra**
**Assistant Attorney General**

**Trent Meriwether**
**Assistant Attorney General**

**P.O. Box 20207**
**Nashville, TN  37202-0207**
**(615) 741-7403**
**meredith.bowen@ag.tn.gov**
**matthew.dykstra@ag.tn.gov**
**trent.meriwether@ag.tn.gov**

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 4

I. Plaintiffs Are Not Entitled to Fees Because They Are Not Prevailing Parties. ......................... 4

    A. The Agreed Order's and Settlement Agreement's *de minimis* relief fail to make Plaintiffs prevailing parties. ..................................................................... 5

    B. The interim-Agreed Order was not preliminary injunctive relief. ....................... 7

    C. The interim-Agreed Order is insufficient to make Plaintiffs prevailing parties. ................. 7

        1. The interim-Agreed Order's relief was not material ...................................... 7

        2. The interim-Agreed Order's relief was not enduring. .................................. 10

    D. Because of their insignificant role, Plaintiff-Intervenors are not prevailing Parties. ................................................................................................................ 11

II. Even if Prevailing Parties, Plaintiffs' Family Barriers to Care Constitute a Special Circumstance Preventing an Award of Fees. ................................................ 11

    A. Amanda Casey's barriers to care. .................................................................... 12

    B. Scarlet Burk's barriers to care. ........................................................................ 14

    C. Binta Barrow's barriers to care. ...................................................................... 15

    D. M.A.C.'s prior barriers to care. ....................................................................... 16

III. Even if Prevailing Parties, Plaintiffs' Requested Amount for Such Meager Relief Would Produce an Unwarranted Windfall. ...................................................... 17

    A. It would be unreasonable to award any fees for the Settlement Agreement or Agreed Order. ............................................................................................. 17

        1. The terms of the Settlement Agreement do not justify the award of any attorneys fees. ................................................................................. 18

i

2. For the interim-Agreed Order, obtaining no relief for Plaintiffs' staffing shortages merits no attorneys' fees....................................................19

B. If any fees are awarded, the fee request should be reduced to account for meager results and prohibited charges.....................................................19

1. Plaintiffs' fee award, if any, should reflect the meager relief obtained.......................19

2. Plaintiffs' fee award, if any, should exclude multiple prohibited categories.....................................................................................................20

   i. Plaintiffs cannot recover fees for Jay Bryant because he dismissed his case with prejudice after refusing to engage in discovery..............................20

      a. Entries for Jay Bryant should be categorically excluded....................21

      b. For work done before Jay Bryant's dismissal, general fees should be cut by 20%.......................................................................21

   ii. Entries for unfiled motions should be cut as unreasonable.....................22

   iii. Entries on behalf of third parties are not compensable. .........................23

   iv. Plaintiffs are not entitled to intervenor-specific entries because Plaintiff-Intervenors are not prevailing parties. ....................................23

   v. Plaintiffs' reliance on *Dowdy v. Smith* is prohibited. ............................23

CONCLUSION...........................................................................................................24

ii

# INTRODUCTION

No one questions that civil rights attorneys can perform an important role in securing the rights of Americans. And where their clients walk away with the court-ordered, material, enduring change they sought in filing the complaint, they deserve at least some attorneys' fees as the "prevailing party." But not every court-approved settlement provides the material, enduring relief necessary to confer that coveted status. That is the case here.

Plaintiffs came to court looking for injunctions, declaratory judgments, and permanent changes to TennCare procedures, all of which they thought would increase the staffing of their Personal Assistance service hours. They walked out of court with none of those things. Although Plaintiffs obtained an interim Agreed Order and a temporary Settlement Agreement incorporated into a judgment, neither provided the relief sought—no injunctions, no declaratory judgment, no procedure changes, and ultimately, no increase in staffing. That is why Plaintiffs are not prevailing parties.

Even if this Court disagrees, it should still find that a "special circumstance" justifies withholding fees entirely. Because Plaintiffs' services are provided in the home, their homes are the caregivers' workplaces. By sworn statements of numerous caregivers, those workplaces were often intolerable and included:

- Family member stealing caregivers' personal belongings.

- Family member using marijuana so extensively that the odor permeated caregivers' clothes.

- Family member demanding caregivers perform prohibited medical tasks.

- Family home routinely being 80 degrees or above.

- Family member belittling caregivers' COVID-19 precautions.

- Family member demanding caregivers leave the restroom door open when using it.

- Family taking 4 months to remedy bedbug infestation.

- Family member ignoring a caregiver's on-the-job heat stroke.

1

- Family member refusing meal breaks, despite caregivers' 8 to 12-hour shifts.

- Family member requiring caregivers to isolate in a Plaintiff's tiny bedroom for 10 to 12-hour shifts.

- Family member critiquing caregivers' personal lives, including sexual orientation.

- Family members refusing to assist caregivers when lifting Plaintiffs, putting both caregiver and Plaintiff at risk of physical injury.

Discovery confirmed that these working conditions were the primary cause of Plaintiffs' staffing shortages. Such conditions would not be tolerated in any other employment context. They should not be rewarded here, especially to the tune of nearly $400,000.

Even if this Court finds Plaintiffs have achieved prevailing party status and a special circumstance does not exist, Plaintiffs are still entitled to no fees based on how little they gained compared to what they sought. And at the very least, their prohibited and unreasonable fee entries should be denied, and their award should reflect only a small fraction of the fees sought.

## BACKGROUND

On July 1, 2021, the hourly wages for caregivers increased from $10.00/hr to $12.50/hr. (D.E. 28-1 at 539.[1]) One day later, and aware of the increase, Plaintiffs sued TennCare, alleging that low rates were the primary cause of their unstaffed Personal Assistance service hours. (D.E. 1 at 2, 10.) Plaintiffs sought preliminary and permanent injunctions prohibiting TennCare from:

1. Withholding medically necessary services,

2. "Implementing unlawful policies," and

3. Denying Plaintiffs due process.

(D.E. 13 at 295.) In attempting to offer solutions, TennCare entered an Agreed Order for the pendency of the case, in exchange for Plaintiffs' withdrawing their preliminary injunction motion.

---

[1] All pincites to record materials reference the "PageID" numbers in the ECF file stamps.

2

(D.E. 19 at 349.)  This Agreed Order did not track the Complaint's requested relief but instead required TennCare to:

1. Offer an incentive to entice current and potential providers to fill Plaintiffs' hours;

2. Allow Plaintiffs the option to enroll in TennCare*Select* to obtain two alternate services (Personal Care or Home Health Aide) to staff their hours; and

3. "[E]xercise good faith, best efforts to ensur[e] staffing of all services described," "tak[ing] all such actions as are necessary and feasible to ensure that all of the services authorized . . . are provided."

(D.E. 17-1 at 340-42.)  This Agreed Order resulted in no significant change in Plaintiffs' staffing situations.  *See infra*, Section I.C.1.

Roughly a year later, the hourly wage for caregivers increased again to $13.75.  (D.E. 116-1, Attachment E.)  At the same time, discovery revealed that the toxic work environments in Plaintiffs' homes, not low wages, caused the staffing issues.  *See infra*, Section II.  And after Plaintiff Bryant refused to respond to discovery, (D.E. 116-1, Attachment B), he voluntarily dismissed his claims with prejudice, leaving four Plaintiffs.  (D.E. 72-1.)

After disclosing the existence of nearly two dozen declarations from prior and prospective caregivers and from the agencies that employed them, and after an unsuccessful mediation, the parties entered into a Settlement Agreement dismissing the case with prejudice.  (D.E. 97 at 1060; D.E. 99.)  Like the Agreed Order, the Settlement Agreement did not track the Complaint's requested relief.  It instead only required TennCare to:

1. "[E]xercise good faith, best efforts to take all such actions as are necessary and feasible to ensure that all the services authorized . . . are provided";

2. Include five intervenors in the settlement; and

3. Mail Plaintiffs and Intervenors a copy of the staffing updates it already receives from its sister agency as part of its current business practices.

3

(D.E. 97 at 1057-61.)  The Settlement Agreement provided that "[n]othing herein shall constitute a determination that Defendants or Plaintiffs are prevailing parties," while also reserving "[a]ll matters relating to the possible award of attorneys' fees for Plaintiffs, if any." (*Id.* at 1060.)  It also expires, either on December 31, 2023, or when TennCare's pending amendments to its 1915(c) Waivers are federally approved, whichever comes first.  (*Id.*)

## ARGUMENT

I.    **Plaintiffs Are Not Entitled to Fees Because They Are Not Prevailing Parties.**

Federal courts follow the "American Rule," requiring each party to pay its own fees unless a statute explicitly provides otherwise. *Planned Parenthood Sw. Ohio Region v. Dewine*, 931 F.3d 530, 538 (6th Cir. 2019).  Plaintiffs sued under the Americans with Disabilities Act, the Rehabilitation Act, and 42 U.S.C. § 1983, which each awards attorneys' fees to "prevailing part[ies]."  42 U.S.C. § 12205 (ADA fees); 29 U.S.C. § 794a(b) (Rehabilitation Act fees); 42 U.S.C. § 1988(b) (§ 1983 fees).

But to acquire prevailing-party status, a plaintiff must demonstrate (1) "a court-ordered change in the legal relationship between [the parties]," *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 604 (2001) (cleaned up), and (2) success "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit," *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (quotations omitted).

This Court should find Plaintiffs are not prevailing parties for two reasons.  *First*, neither the Agreed Order nor the Settlement Agreement provided any of the benefit Plaintiffs sought. *Second*, Plaintiff-Intervenors are not prevailing parties considering their insignificant role in this litigation.

4

**A.  The Agreed Order's and Settlement Agreement's *de minimis* relief fail to make Plaintiffs prevailing parties.**

Not just any court-approved agreement will confer prevailing-party status.  It still must have "achieve[d] some of the benefit" sought.  *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 620 (6th Cir. 2013) (quoting *Buckhannon*, 532 U.S. at 604, and *Hensley*, 461 U.S. at 433).  As "masters of their complaint[]," *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 512 (1989), Plaintiffs chose the relief their Complaint sought but obtained none of it.

A *de minimis* victory "may be so insignificant . . . as to be insufficient to support prevailing party status."  *Farrar v. Hobby*, 506 U.S. 103, 113 (1992) (quoting *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989)).  Relief can be *de minimis* where it provides lesser relief in a form that a plaintiff "had not even sought."  *Booker v. Waters*, 145 F.3d 1330, *4 (6th Cir. 1998) (quoting *Garland*, 489 U.S. at 793).  It can also be *de minimis* when there is "no evidence" the relief obtained was ever unavailable.  *Garland*, 489 U.S. at 792 (stating prevailing-party status would be unmerited solely based on *de minimis* relief requiring school to allow union access although "no evidence" showed access had ever been refused).

Compared to their Complaint's requests, the relief in the Agreed Order and Settlement Agreement are *de minimis*.  The Complaint sought a declaratory judgment that Defendants violated federal laws, and it asked for preliminary and permanent injunctions that Plaintiffs never received, as summarized below:

| Comparison Scorecard for<br>Relief Sought in Complaint v. Relief Obtained | | |
|---|:---:|:---:|
| **Relief Sought in the Complaint** | **Within Agreed Order?** | **Within Agreement?** |
| 1   A declaratory judgment that Defendants have violated Plaintiffs' rights under federal law. | **NO** | **NO** |
| 2   A declaratory judgment declaring unlawful the Defendants' policies that perpetrated violations of Plaintiffs' rights. | **NO** | **NO** |
| 3   Preliminary and permanent injunctive relief prohibiting Defendants from withholding medically necessary services in violation of the Medicaid Act and the ADA. | **NO** | **NO** |
| 4   Preliminary and permanent injunctive relief prohibiting Defendants from implementing the unlawful policies complained of in the Complaint. | **NO** | **NO** |
| 5   Preliminary and injunctive relief prohibiting the Defendants from denying the Plaintiffs due process of law, in violation of the Medicaid Act and the Fourteenth Amendment to the United States Constitution. | **NO** | **NO** |
| **Total Score(s):** | **0/5** | **0/5** |

Through the Settlement Agreement, TennCare agreed to "exercise good faith, best efforts to take all such actions as are necessary and feasible to ensure that all the services authorized . . . are provided," to allow Plaintiff-Intervenors to join, and to copy them all on a piece of mail—a copy of the publicly available staffing updates it already receives from its sister agency, the Department of Intellectual and Developmental Disabilities ("DIDD"), as part of its current business practices. (D.E. 97 at 1057-61; D.E. 19 at 349.) But this was based on "no evidence" that TennCare ever refused to do these things, it was not Plaintiffs' requested accommodation (staffed hours), and it was "not even [what they] sought" in bringing this lawsuit. *Garland*, 489 U.S. at 792; *Booker*, 145 F.3d at *4. This falls short of even the nominal relief required for prevailing-party status. It is *de minimis* at best.

6

**B. The interim-Agreed Order was not preliminary injunctive relief.**

Plaintiffs describe the interim-Agreed Order as "injunctive relief" and assume that caselaw regarding preliminary injunctions applies without explaining why. (*See, e.g.*, D.E. 112-1 at 1366-73 (citing *Sole*, *Miller*, *Hargett*, *McQueary*, and *Wilson*—all preliminary injunction cases).) This Court should reject that assumption since it never made the required findings for any of the usual four preliminary injunction factors. *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003) ("[D]istrict court[s] must assess four factors in deciding . . . preliminary injunctions."). That is because Plaintiffs withdrew their preliminary injunction motion upon entering the Agreed Order. (D.E. 19 at 349.)

**C. The interim-Agreed Order is insufficient to make Plaintiffs prevailing parties.**

Yet even if this Court finds that preliminary injunction caselaw applies, the result is the same here—this interim-Agreed Order does not confer prevailing-party status. Like any final relief, preliminary relief must be "material," meaning it "directly benefited [Plaintiffs] . . . based on the relief requested in [their] complaint, not . . . on [the relief's] practical significance." *McQueary v. Conway*, 614 F.3d 591, 602 (6th Cir. 2010). And while interim, the preliminary relief must still be "enduring" or "irrevocable," "meaning it must have provided plaintiffs with everything they asked for." *Miller v. Caudill*, 936 F.3d 442, 448 (6th Cir. 2019). Otherwise, it is only a "symbolic victory, which § 1988(b) does not compensate." *McQueary*, 614 F.3d at 598.

**1. The interim-Agreed Order's relief was not material.**

Here, despite its arguable symbolism, the interim-Agreed Order fails to make Plaintiffs prevailing parties. It essentially required three things of TennCare:

1. Offer current and potential providers incentives to fill Plaintiffs' hours;

2. Allow Plaintiffs to enroll in TennCare*Select* to obtain two alternate services (Personal Care or Home Health Aide) to staff their hours; and

7

3. "[E]xercise good faith, best efforts to ensur[e] staffing of all services described." (D.E. 19 at 347-49.) Plaintiffs did not seek any of this relief in their Complaint. Requirement One did not make Plaintiffs' homes any more staffed today than the day they filed suit—every Plaintiff refused to change providers, rendering incentives to potential providers meaningless. (D.E. 116-1.) As to Requirement Two, every Plaintiff declined the alternate services. (D.E. 116-1.) And there is no evidence TennCare was not performing Requirement Three before, during, and following this lawsuit for *every* TennCare enrollee state-wide. These are not material terms. If they were, Plaintiff-Intervenors would have sought this relief. They did not. (D.E. 107-1 at 1138 (billing entry for Intervenor a mere five days after entering the Agreed Order).)

Neither did this relief actually "provide the in-home care required to meet the Plaintiffs' acknowledged needs," the Complaint's stated goal. (D.E. 13 at 258.) Plaintiffs allege they are receiving more hours of staffed Personal Assistance services because of the Agreed Order and Settlement Agreement than at the time of filing. (D.E. 112-1 at 1367.) Plaintiffs illustrate this by including in their fee request four charts, but they all lacked sufficient information to compare their staffing *before* filing suit to *after*. (*Id.* at 1368-70.) Further, alleged staffed hours of Plaintiffs Barrow and Burk are inflated because they include more services than just Personal Assistance services. (D.E. 116-2.) Even the number of hours they allege Plaintiffs Barrow and Casey are entitled to is incorrect. (*Id.*) The correct amount is in Plaintiffs' Independent Support Plans, attached to their Complaint.[2] (*Id.*) And they do not even tell the Court how many hours Plaintiff M.A.C. is entitled to. These deficiencies leave their charts unhelpful at best, if not misleading.

---

[2] Scarlet Burk attached an ISP that was denied by DIDD because the number of Personal Assistant service hours exceeded the monthly limit (215 hours); in turn, this maximum limit was approved for her. (D.E. 116-2.)

To provide the clarity Plaintiffs' charts lack, attached are verified staffing records for all four Plaintiffs from May 2021—right before they filed—to December 2022—right after they settled. (D.E. 116-3; D.E. 116-4; D.E. 116-5; D.E. 116-6.) These staffing records for Personal Assistance services, the service at issue in this case, show that three Plaintiffs are either worse off or achieved only negligible increase in staffing throughout the course of this case.

| Plaintiff | % Hours Unstaffed May 2021 | % Hours Unstaffed August 2022 | % Hours Unstaffed December 2022 |
|---|---|---|---|
| Binta Barrow | 18% | 25% | 25% |
| Amanda Casey | 85% | 87% | 76% |
| Scarlet Burk | 40% | 57% | 65% |

To be sure, all Plaintiffs experienced staffing fluctuations in the intervening months. But there is no knowing what caused these vacillations—perhaps the July 2021 legislatively required hourly wage increase to $12.50 the day before they filed suit, or the July 2022 increase to $13.75? But despite these substantial wage increases, and an interim-Agreed Order and Settlement Agreement, the bottom line is that these three Plaintiffs are left with the status quo, which this Court has recognized does *not* confer prevailing-party status. *Jones v. Haynes*, 350 F. Supp. 3d 691, 695-96 (M.D. Tenn. 2018) (Crenshaw, J.) (citing *McQueary*, 614 F.3d at 598).

Plaintiff M.A.C. is a different story. Shortly after filing this lawsuit, her family ceased behavior that had deterred countless caregivers: They no longer asked caregivers to perform tasks outside their job description, stopped being disrespectful, and stopped refusing to assist transferring M.A.C. (D.E. 116-7.) There were also no more bedbugs, no stolen property, and no marijuana smell in the house. (*Id.*) The result? Consistently improved staffing as shown below.



(D.E. 116-6.)  M.A.C.'s family barriers are more fully discussed in Section II.D., *infra*.

### 2. The interim-Agreed Order's relief was not enduring.

Plaintiffs argue that their relief is enduring because "[n]othing can take away filled [caregiver] hours that [they] have already received."  (D.E. 112-1 at 1373.)  But the temporary nature of that relief "counsel[s] *against* fees."  *McQueary*, 614 F.3d at 601 (emphasis added).  The Sixth Circuit has only awarded fees in cases where a plaintiff obtains an irrevocable change in legal status that could not later be taken away.  *Miller*, 936 F.3d at 449-50 (gaining a marriage license via preliminary injunction); *Wilson v. Long*, No. 3:14-CV-01492, 2020 WL 434091, at *5 (M.D. Tenn. Jan. 28, 2020) (gaining one-and-done hearings via preliminary injunction); *see also Dahlem ex rel. Dahlem v. Bd. of Educ.*, 901 F.2d 1508, 1513 (10th Cir. 1990) (finding relief enduring when preliminary injunction allowed plaintiff to "participate in interscholastic gymnastics during his senior year"—the relief sought).  Unlike any of these irrevocable forms of relief, none of the Plaintiffs can point to any relief they have received that is permanent.  They sought changes to TennCare policies that would ensure increased staffing of their hours *indefinitely*, not just "during the pendency of litigation," or even until the end of this year.  (D.E. 19 at 346.)  What of *lasting* value have Plaintiffs gained from the interim-Agreed Order?  Nothing.

10

**D. Because of their insignificant role, Plaintiff-Intervenors are not prevailing parties.**

Plaintiff-Intervenors can only be prevailing parties if "without [their] efforts, the [relief] would not have come to fruition." *Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 504 F.3d 634, 645 (6th Cir. 2007); *see Wilder v. Bernstein*, 965 F.2d 1196, 1204 (2d Cir. 1992) (conferring prevailing-party status only where intervenors "contributed importantly to the creation of remedies").

Plaintiff-Intervenors' efforts were insignificant here. They did not sign onto the Agreed Order, did not serve or receive discovery, did not attend mediation, and were not represented at any status conferences before this Court. They merely piggybacked on the meager relief Plaintiffs obtained, having moved to intervene just two weeks before the parties filed the Settlement Agreement. (D.E. 97.) This Court should thus find that they did not prevail.

**II.     Even If Prevailing Parties, Plaintiffs' Family Barriers to Care Constitute a Special Circumstance Preventing an Award of Fees.**

If this Court finds that Plaintiffs are prevailing parties, it still must not award attorneys' fees if justified by Defendants' "strong showing" that a special circumstance exists. *Deja Vu v. Metro. Gov. of Nashv. & Davidson Cnty.*, 421 F.3d 417, 422 (6th Cir. 2005). Courts analyze this on a case-by-case basis. *Id.*

A "nuisance settlement" is a "special circumstance" that can make an award of attorneys' fees unjust. *Tyler v. Corner Const. Corp.*, 167 F.3d 1202, 1206 (8th Cir. 1999) (citing *Fisher v. Kelly*, 105 F.3d 350, 353 (7th Cir.1997), and *Ashley v. Atl. Richfield Co.*, 794 F.2d 128, 134-35 n.9 (3d Cir. 1986)). A nuisance settlement is one "that is accepted despite the fact that the case against the defendant is frivolous or groundless, solely in an effort to avoid the expense of litigation." *Id.* In such situations, courts should "concentrate on the objective meritoriousness of a plaintiff's claim." *Id.*

11

Here, the Settlement Agreement is nothing more than a nuisance settlement because Plaintiffs' claims were objectively groundless. Each Plaintiff, in their Verified Complaint, testified that their daughters' staffing issues were caused by low wages.[3] But they knew that was not the case. As nearly two dozen sworn witness statements certified, toxic working conditions in Plaintiffs' homes—not the low wages—were squarely to blame for their staffing issues. The Sixth Circuit has found that even lesser barriers than those described below absolve the State of any liability associated with staffing issues. *Nored as next friends of Nored v. Tenn. Dep't of Intell. & Devel. Disabs.*, No. 21-5826, 2022 WL 4115962, at *9-10 (6th Cir. Sept. 9, 2022), *cert. denied*, No. 22-538 (U.S. Feb. 21, 2023) ("[N]on-negotiable conditions" created by the parents of an intellectually disabled TennCare enrollee were to blame for his staffing issues.).

### A. Amanda Casey's barriers to care.

According to caregivers, Amanda Casey's staffing issues have been long-standing but have never had anything to do with wages and everything to do with the conditions created by Amanda's mother, Ronda Coggins. Caregiver after caregiver described Ms. Coggins as overbearing, intimidating, unkind, manipulative, and judgmental. (D.E. 116-8; D.E. 116-9; D.E. 116-10; D.E. 116-11; D.E. 116-12; D.E. 116-13; D.E. 116-14; D.E. 116-15; D.E. 116-16.) She is, in short, "impossible to please." (D.E. 116-16.)

The working conditions in the home did not help. Ms. Coggins insists on setting the thermostat so high that the home's temperature is usually 80 degrees or higher, causing caregivers

---

[3] M.E.C. (D.E.1 at 14, ¶¶ 45, 46) (alleging low rates and inadequate network) (*Id.* at 41) (attesting to allegations under penalty of perjury); Felicia Burk (*Id.* at 16, ¶ 67) (alleging inadequate network) (*Id.* at 42) (attesting to allegations under penalty of perjury); Sadiatou Jallow (*Id.* at 21, ¶¶ 84, 87) (alleging inadequate network) (*Id.* at 43) (attesting to allegations under penalty of perjury); Ronda Coggins (*Id.* at 25, 27, ¶¶ 100, 117) (alleging inadequate network) (*Id.* at 45) (attesting to allegations under penalty of perjury).

12

to sweat through their clothes. Under these stifling conditions, she requires 10 to 16-hour shifts and does not allow caregivers to take breaks, not even to eat. Many caregivers were never even allowed to sit down during their shifts without being accused of being lazy and given additional tasks, even ones outside of their job description, like cleaning rooms Amanda never used. The Casey home is in a very rural location with no cellular service, yet Ms. Coggins withholds Wi-Fi access, preventing caregivers from using their phones, sometimes overnight, not even to be reached by their own families in the event of emergencies. For night shifts, things worsen. Night-shift caregivers work in darkness with only one tiny stove light allowed, in mandated silence, and were prohibited from closing the bathroom door—when in use—because Ms. Coggins was afraid it would wake Amanda. Even stepping outside for air is impossible: Ms. Coggins sets the house alarm to ensure caregivers remain inside. (D.E. 116-8; D.E. 116-9; D.E. 116-10; D.E. 116-11; D.E. 116-12; D.E. 116-13; D.E. 116-14; D.E. 116-15; D.E. 116-16.)

Caregivers were not immune from Ms. Coggins's relentless gossip among staff and her constant criticism of their weight, attractiveness, and sexual orientation. (D.E. 116-8; D.E. 116-9; D.E. 116-10; D.E. 116-11; D.E. 116-12; D.E. 116-15; D.E. 116-16.) Ms. Coggins openly disapproved of one lesbian caregiver, making snide remarks to the caregiver's face and negative comments behind her back to other caregivers. Ms. Coggins even went so far as to brazenly make Valentine's Day dinner reservations for this caregiver, insisting she take a male friend as her date. The caregiver declined. (D.E. 116-10.)

Two caregivers recalled that on a very hot summer day in July 2019, while driving Amanda to a physical therapy appointment, Ms. Coggins refused to turn on the air-conditioning or roll down any of the windows in her van. Despite both caregivers voicing concerns about the heat, Ms. Coggins would not acknowledge that Amanda was sweating and that the one caregiver was

13

suffering from heat stroke. The caregiver's health had deteriorated so much by the time they arrived at the appointment that the staff at the physical therapist's office called 911. The caregiver was transported to the hospital by ambulance and admitted. Despite their love for Amanda, both caregivers quit after the incident. They simply could not work for someone who treated them "worse than a dog." (D.E. 116-15; D.E. 116-16.)

**B. Scarlet Burk's barriers to care.**

Scarlet Burk's staffing issues are a result of the nonnegotiable conditions and toxic working environment created by her mother, Felicia Burk, not insufficient wages as claimed. Scarlet's care has been staffed by one single provider agency since 2007. In that time, it has offered over 100 prospective caregivers to staff her hours. Ms. Burk rejected them all. She has always controlled Scarlet's staffing by only recruiting family or friends herself. (D.E. 116-17.)

Besides caregivers that were presented to Ms. Burk, Scarlet's agency did not present hundreds of others because they failed to meet her screening requirements. For example, upon the rollout of COVID-19 vaccines, Ms. Burk required that all caregivers be fully vaccinated—an arguably reasonable requirement, but one with consequences in a rural Tennessee county where vaccinated applicants were elusive. But even those the agency found, Ms. Burk rejected. And Ms. Burk did not apply this requirement equally, allowing an unvaccinated friend to staff the hours. (D.E. 116-17; D.E. 116-18; D.E. 116-19.)

Her provider agency reported that during litigation, for the first time, Ms. Burk agreed to standard in-home meetings with prospective caregivers. Despite this change, multiple willing and able applicants described Ms. Burk as rude, pushy, and intimidating during the meetings, making them all feel uncomfortable. Regardless, Ms. Burk rejected every single one, often fabricating reasons. (D.E. 116-17; D.E. 116-18; D.E. 116-19; D.E. 116-20; D.E. 116-21.)

14

Even for family-friend caregivers who did staff her hours, they reported Ms. Burk demanded things outside their job descriptions, like cleaning another person's home. One caregiver said she would never go back because Ms. Burk's treatment of Scarlet was "harsh and excessive." (D.E. 116-22.)

In short, according to her provider agency, Ms. Burk made Scarlet's case "the most difficult family to serve[,] . . . the most time-consuming by far." (D.E. 116-17.) Even her Independent Support Coordinator (ISC), a 17-year veteran, said that Scarlet was by far the hardest case to staff because Ms. Burk was so difficult, testifying that "I believe that if it hadn't been for Ms. Burk, Scarlet wouldn't have staffing issues." (D.E. 116-23.)

**C. Binta Barrow's barriers to care.**

The same story holds true for Binta Barrow's staffing issues—her mother, Sadiatou Jallow, perpetuates the problem. Both the owner and the Program Director of Binta's previous provider agency, two home-health veterans, reported years of difficulties staffing Binta's hours, describing Ms. Jallow as the most difficult person they ever encountered. Even among caregivers, word got out about Ms. Jallow's ways: she became notorious for being demanding, difficult, and quick to threaten to sue or to call the media when upset, causing some to refuse to staff Binta's hours, even when offered to be paid overtime. (D.E. 116-24; D.E. 116-25.)

Ms. Jallow persistently gossips about caregivers *to* caregivers. She also requires 10 to 12-hour shifts, during which caregivers must remain in Binta's bedroom, unable to leave except to use the bathroom. And risking caregivers' safety, Ms. Jallow refuses to equip Binta's room with a lift to assist when transferring Binta, which is difficult for some and impossible for others, limiting the caregiver pool. (D.E. 116-24; D.E. 116-25; D.E. 117, p. 147-48.)

15

For any willing and able caregiver, Ms. Jallow routinely rejects or terminates them. The owner of Binta's prior provider agency said that Ms. Jallow was so picky that she would reject almost everyone. (D.E. 116-24.) Even Binta's long-time ISC testified that Ms. Jallow was responsible for the staffing problems. (D.E. 117, p. 182-84.)

**D. M.A.C.'s prior barriers to care.**

As with the others, M.A.C.'s staffing issues stemmed from toxic working conditions created by her mother, M.E.C., and other family members. Multiple caregivers requested to be reassigned from M.A.C.'s home because of the barriers imposed by M.A.C.'s family. (D.E. 118, p. 111-35; D.E. 119; D.E. 120; D.E. 121.) In fact, after serving thousands of families for 27 years, M.A.C.'s provider agency had never issued an intent-to-discharge letter to a family—until the M.A.C. family. (D.E. 122, p. 107.),

One caregiver reported that the family belittled her for wearing gloves and a mask during the height of COVID-19, telling her it was offensive. (D.E. 118, p. 131 and Exhibit 8.) Another reported the home smelled of marijuana, causing concerns that she might end up smelling like it. That same caregiver discovered bedbugs in M.A.C.'s bedroom, which took the family four months to rectify. (D.E. 119.) M.A.C.'s sister also had a reputation for stealing from caregivers' purses, so much so that caregivers were told not to bring personal items into the home. (D.E. 121; D.E. 130, p. 231-32.) And regularly, her mother would demand caregivers do things outside their job training, including tube feedings and medicine administration, risking both M.A.C.'s safety and the caregivers' jobs. (D.E. 118, p. 104.)

Another significant barrier voiced by caregivers is that, without assistance, it was too strenuous to lift M.A.C. because she is non-ambulatory and has a steel rod in her back. Yet despite committing in her Independent Support Plan to help with transfers, her family refused. Repeatedly,

caregivers reported the family was rarely available, hardly ever within ear shot, and always irritated when asked to help. Her mother was rarely at home during the caregivers' shifts, leaving M.A.C.'s siblings to fight with each other over who should help. Having to leave M.A.C. alone to find help, or having to lift her alone, put both M.A.C. and the caregiver at risk. These issues spanned several years and were consistent across multiple provider agencies that served her. (D.E. 119; D.E. 120; D.E. 121; D.E. 118, p. 90-99.)

Thus, just like with Amanda, Scarlet, and Binta, M.A.C.'s family caused her staffing issues. For every Plaintiff, these extensive family barriers and non-negotiables make their claims objectively meritless. *Nored*, 2022 WL 4115962, at *9-10; *Tyler*, 167 F.3d at 1206. No one should be allowed to sue, knowing they caused their injury, settle for a piece of mail, and receive nearly $400,000 as a result. Were this the case—especially with such overwhelming evidence presented here—no defendant would have any incentive to settle but every reason to litigate to trial. This Court should therefore find that this overwhelming evidence represents a special circumstance justifying withholding fees.

### III. Even If Prevailing Parties, Plaintiffs' Requested Amount for Such Meager Relief Would Produce an Unwarranted Windfall.

#### A. It would be unreasonable to award any fees for the Settlement Agreement or interim-Agreed Order.

Even if this Court finds that Plaintiffs are prevailing parties and that no special circumstance exists, it would still be unreasonable to award them any fees. A § 1988 fee should be reasonable "in relation to the results obtained." *Hensley*, 461 U.S. at 440. To that end, "[i]n some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive no attorney's fees at all." *Farrar*, 506 U.S. at 115. This is because courts must prevent "windfall[s] to [ineffective] attorneys." *Dewine*, 931 F.3d at 542 (quotations omitted).

Therefore, courts "adjust the award based on . . . the most critical factor"—"the degree of success obtained" as compared to what they originally sought. *Binta B.*, 710 F.3d at 628 (quotations omitted). In fact, courts must consider this "particularly important" factor, especially in § 1983 cases challenging institutional practices. *Hensley*, 461 U.S. at 436; *Dewine*, 931 F.3d at 543. Here, Plaintiffs' failure to secure the relief initially sought in their Complaint counsels against awarding fees.

### 1. The terms of the Settlement Agreement do not justify the award of any attorneys' fees.

The Settlement Agreement gave Plaintiffs none of their requested relief—no injunctions and no order requiring TennCare to provide medically necessary services, to change its policies, or to change its appeal process. There is no evidence that TennCare does not "exercise[] . . . good faith" in ensuring staffing for every enrollee—even those that do not sue. (D.E. 97 at 1057.)

That leaves mutual monitoring, which merely requires TennCare to send an affected Plaintiff a *copy* of the monitoring reports *that TennCare has always exchanged* with DIDD. (D.E. 97 at 1058.) That "benefit"—TennCare's mailing of a publicly available document—lasts only for one year at most. (D.E. 97 at 1060-61.) This is the exact same information that Plaintiffs could have obtained at any time through a public records request. *See* Tenn. Code Ann. § 10-7-503(a)(2)(A). While convenient to not have to submit a request for a year, it falls short of meriting fees.

Plaintiffs might have been entitled to fees if that piece of mail was their ultimate goal. *Miller*, 936 F.3d at 450 (awarding fees where relief fell short of complaint's request but achieved ultimate goal of lawsuit). But Plaintiffs sought a host of injunctive relief that would have fundamentally altered TennCare's operations. They obtained a monthly piece of mail instead.

18

Without more, this Court should hold that Plaintiffs' relief merits "no fee at all." *Farrar*, 506 U.S. at 115.

### 2. For the interim-Agreed Order, obtaining no relief for Plaintiffs' staffing shortages merits no attorneys' fees.

Like the Settlement Agreement, the Agreed Order provides none of the Complaint's requested relief. And as stated above, it failed Plaintiffs' ultimate goal—staffed service hours. *See supra*, Section I.C.1.; (D.E. 13 at 258.) Neither side knew whether the provider incentives or the alternative services would work. And neither option did work: no Plaintiff opted for any provider that took the incentive, and no Plaintiff opted for the alternative services. (D.E. 116-1.). Further, there was no evidence that TennCare was not "[e]xercis[ing] good faith, best efforts to ensur[e] staffing of all services described." (D.E. 19 at 347-49.) Again, no Plaintiff is better off today than when they filed suit. To award Plaintiffs any fees for such results would be the "windfall" every court should avoid. *Farrar*, 506 U.S. at 115.

### B. If any fees are awarded, the fee request should be reduced to account for meager results and prohibited charges.

#### 1. Plaintiffs' fee award, if any, should reflect the meager relief obtained.

Even if this Court finds that the mailing of a publicly available document or the meager Agreed Order merits any fee at all, it should heavily reduce Plaintiffs' attorneys' fee request "in relation to the results obtained." *Hensley*, 461 U.S. at 440. Considering the meager results, the State suggests a 95% reduction, after accounting for prohibited charges below. *Ohio Right to Life Soc., Inc. v. Ohio Elec'ns. Comm'n*, 590 Fed. Appx. 597, 605 (6th Cir. 2014) (holding an 85% reduction "attributed to limited success alone . . . might be reasonable by itself" but for district court's deficient explanation); *cf. Hines v. City of Columbus*, 676 Fed. Appx. 546, 557 (6th Cir. 2017) (affirming a 50% reduction where district court explained plaintiff received only a "sliver"

19

of requested relief); *Helfman v. GE Grp. Life Assur. Co.*, No. 06–13528, 2011 WL 1464678 (E.D. Mich. Apr. 18, 2011) (reducing fee request "by 87.5% to account for the fact that plaintiff was awarded disability benefits for only 12.5% of the months for which he sought benefits").

### 2. Plaintiffs' fee award, if any, should exclude multiple prohibited categories.

Here, Plaintiffs seek fees for four unreasonable categories: (1) Jay Bryant-related entries, (2) unfiled-motion entries, (3) work on behalf of third-parties, and (4) work on behalf of Plaintiff-Intervenors. None are compensable.

#### i. Plaintiffs cannot recover fees for Jay Bryant because he dismissed his case with prejudice after refusing to engage in discovery.

Plaintiffs are not entitled to fees for work related to former-Plaintiff Jay Bryant who dismissed his case *with prejudice* rather than answer Defendants' discovery. (D.E. 116-1.) Deadlines came and went, and Mr. Bryant provided no objections or responses, nor did his counsel offer an explanation. (*Id.*).

Initially, two months after receiving Defendants' discovery, Mr. Bryant filed a motion to be removed as a Plaintiff *without prejudice*. (D.E. 68 at 863.) After the State pushed back (D.E. 116-1, Attachment D), the parties filed a joint, proposed agreed order that Mr. Bryant would dismiss his claims *with prejudice* because he "no longer [sought] the relief requested in Plaintiffs' Verified Complaint." (D.E. 72-1; D.E. 94.) That "final disposition" "left nothing for [this Court] to decide" on his claims. *Jennings v. Metro. Gov't of Nashville*, 715 F.2d 1111, 1114 (6th Cir. 1983) (reversing award of fees where order of dismissal with prejudice reflected parties' intent to exclude fees).

Plaintiffs' do not make any allegation that Mr. Bryant benefitted from this litigation, not mentioning him once. (D.E. 112-1 at 1368-70 (only discussing alleged benefits received for other four plaintiffs).) Yet they still seek fees for this work. This Court should thus: (a) exclude any

20

entries directly referencing Mr. Bryant; and (b) as one of five original Plaintiffs, reduce all general time entries before his dismissal by 20%.

### a. Entries for Jay Bryant should be categorically excluded.

This Court should categorically exclude time entries directly referencing Mr. Bryant, which total $6,675. (D.E. 124 (calculating total).) When multiple plaintiffs join a civil rights action, "no award should be made for time the lawyer spent on behalf of [plaintiffs] whose civil rights claims were dismissed," because "those [plaintiffs] are clearly not prevailing parties." *Perkins v. Cross*, 728 F.2d 1099, 1100 (8th Cir. 1984).

### b. For work done before Jay Bryant's dismissal, general fees should be cut by 20%.

The bulk of the time entries do not differentiate work done for each Plaintiff. The bulk entries, up to Mr. Bryant's dismissal, total $222,980. (D.E. 125 (calculating total, excluding other prohibited charges).) For example, Mr. Bonnyman's time entries do not identify any plaintiff below:

| | | |
|---|---|---|
| 5/17/2021 | Phone conference with Cady Kaiman, Laura Revolinski, Clay Capp and Vanessa Zapata re. potential causes of action, theory of the case and fact development | 1.2 |
| 5/24/2021 | Phone conference with Cady Kaiman, Laura Revolinski, Clay Capp and Vanessa Zapata re. potential plaintiffs and causes of action | 0.9 |
| 6/1/2021 | Reviewed and revised draft complaint | 0.5 |
| 6/2/2021 | Reviewed and revised draft complaint | 2.5 |
| 6/3/2021 | Reviewed and revised draft complaint | 0.5 |
| 6/7/2021 | Phone conference with Cady Kaiman, Vanessa Zapata, Clay Capp and Mattie McMurtry re. complaint and strategy | 0.7 |
| 6/8/2021 | Revised complaint | 2.0 |
| 6/9/2021 | Revised complaint | 2.0 |
| 6/10/2021 | Revised complaint | 1.5 |
| 6/18/2021 | Revised complaint | 3.0 |

(D.E. 105-1 at 1092-93.)

To reflect Mr. Bryant's dismissal, this Court should reduce these undifferentiated fees by 20%, equaling $44,596. *Sierra Club v. U.S. Army Corps.*, 776 F.2d 383, 393-94 (2d Cir. 1985)

21

(holding if 1 of 12 plaintiffs was ineligible for fees under a fee-shifting statute, fee award would equal 11/12 of request); *Williams v. Butler*, 746 F.2d 431, 443 (8th Cir. 1984) (affirming 25% reduction where 1 of 2 plaintiffs prevailed in 1983 action); *cf. Redding v. Fairman*, 717 F.2d 1105, 1119 (7th Cir. 1983) (claims of winning and losing plaintiffs were interrelated and lawyer's time "cannot be apportioned among them").

### ii. Entries for five unfiled motions should be cut as unreasonable.

Plaintiffs seek $28,615 for five unfiled motions, including for class certification, preliminary injunction, reconsideration, consolidation, and nonsuit. (D.E. 126 (calculating total).) These motions are not the result of "unsuccessful research or litigation" as Plaintiffs hope. (D.E. 112-1 at1373 (quoting *Northcross v. Bd. of Ed. Of Memphis City Sch.*, 611 F.2d 624, 636 (6th Cir. 1979)).) *Northcross* and its progeny award fees if the motion was *filed*.

In limited circumstances, fees can be awarded for *unfiled* motions that later aided a plaintiff. *Clements v. Prudential Protective Servs., LLC*, 659 Fed. Appx. 820, 828 (6th Cir. 2016) (awarding fees for unfiled motion *in limine* because its preparation helped counsel successfully exclude the same evidence at trial). But otherwise, fees for unfiled motions are usually struck as unreasonable. *See, e.g., Hance v. Norfolk S. Ry. Co.*, No. 3:04-CV-160, 2007 WL 3046355, at *8 (E.D. Tenn. Oct. 16, 2007) (striking fees for unfiled summary judgment motion); *Clark v. W. Iris Transp., Inc.*, No. CV-18-168-DLB-CJS, 2020 WL 2781601, at *11 (E.D. Ky. Feb. 27, 2020), *report and recommendation adopted*, No. CV-18-168-WOB-CJS, 2020 WL 2789910 (E.D. Ky. Mar. 19, 2020) (same for unfiled motions for class cert and to strike).

In the context of unfiled motions for cases that settle, plaintiffs bear the burden of proving the reasonableness of fees by "explain[ing] how" the unfiled motions facilitated settlement negotiations. *Supler v. FKAACS, Inc.*, No. 5:11-CV-229-FL, 2013 WL 6713120, at *3 (E.D.N.C.

22

Dec. 19, 2013) (denying fees for unfiled summary judgment motion for failing to explain how it helped achieve settlement). Plaintiffs attempted no such explanation here, and any argument "in [their] reply brief . . . comes one brief too late." *United States v. One (1) Cessna Skyhawk*, No. 1:18-CV-01160-JDB-JAY, 2021 WL 1566079, at *6 (W.D. Tenn. Apr. 21, 2021) (citing *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (cleaned up) ("Time, time, and time again, we have reminded litigants that we will treat an argument as forfeited when it was not raised in the opening brief.")).

### iii. Entries on behalf of third parties are not compensable.

Plaintiffs seek fees for 10.1 hours of work done for individuals *that never intervened*—the Olin brothers. This work for third parties, which totals $3,520, should be cut as categorically non-compensable. (D.E. 127 (calculating total).)

### iv. Plaintiffs are not entitled to intervenor-specific entries because Plaintiff-Intervenors are not prevailing parties.

Plaintiffs seek fees for intervenor-specific entries, but Plaintiff-Intervenors are not prevailing parties. *See supra*, Section I.D. Thus, the $28,355 in fees related to them is non-compensable. (D.E. 128 (calculating total).)

### v. Plaintiffs' reliance on *Dowdy v. Smith* is prohibited.

Last, Plaintiffs argue that their fee is reasonable compared to that granted in *Dowdy v. Smith*, 3:21-cv-00179 (M.D. Tenn.). (D.E. 112-1 at 1380.) This Court should ignore these comparisons, none of which discuss what actually occurred in *Dowdy*—because they cannot. That settlement's terms prohibit it from being presented as evidence. (*Dowdy*, 3:21-cv-00179, D.E. 21 at 189; D.E. 24.)

23

Considering the above, a reasonable fee is no more than $13,881.17, as depicted below:

| Description | Amount | Supporting Documents |
|---|---|---|
| **Fee Request** | **$389,384.30** | (D.E. 112 at 1359.) |
| Bryant-Specific | -$6,675.00 | (D.E. 124.) |
| 20% Reduction of Undifferentiated Entries | -$44,596.00 | (D.E. 125.) |
| Unfiled-Briefs | -$28,615.00 | (D.E. 126.) |
| Third-party (Olins) | -$3,520.00 | (D.E. 127.) |
| Plaintiff-intervenors | -$28,355.00 | (D.E. 128.) |
| **Subtotal** | $277,623.30 | |
| 95% Reduction for Meager Degree of Success | -$263,742.14 | |
| **Reasonable Fee Amount** | **$13,881.17** | |

## CONCLUSION

Defendants recognize that civil rights attorneys perform an important function, often vindicating the rights of aggrieved citizens. That did not happen here. This Court should reject Plaintiffs' fee request or reduce the award to $13,881.17.

24

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General & Reporter

*/s/ Meredith W. Bowen*
MEREDITH W. BOWEN (BPR# 34044)
Senior Assistant Attorney General
MATTHEW P. DYKSTRA (BPR# 38237)
Assistant Attorney General
TRENTON MERIWETHER (BPR# 38577)
Assistant Attorney General

Office of the Tennessee Attorney General
Healthcare Division
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Meredith.Bowen@ag.tn.gov
Matthew.Dykstra@ag.tn.gov
Trenton.Meriwether@ag.tn.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Opposition to Plaintiffs' Motion for Attorneys' Fees & Costs has been served via this Court's electronic filing system on this 27th day of February, 2023.

| COUNSEL OF RECORD | PARTY REPRESENTED |
|---|---|
| George Gordon Bonnyman, Jr.<br>Brant Harrell<br>Vanessa M. Zapata<br>Tennessee Justice Center<br>211 7th Avenue, N., Suite 100<br>Nashville, TN 37219<br>Office: (615) 255-0331<br>Fax:    (615) 255-0354<br>gbonnyman@tnjustice.org<br>bharrell@tnjustice.org<br>vzapata@tnjustice.org | Counsel for Plaintiffs |

*/s/ Meredith W. Bowen*
MEREDITH W. BOWEN
Senior Assistant Attorney General

26