UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

M.A.C. by next friend M.E.C., et al.,        )
                                              )
    Plaintiffs,                              )
                                              )
v.                                            )     NO. 3:21-cv-00509
                                              )
STEPHEN SMITH, et al.,                        )
                                              )
    Defendants.                              )

# MEMORANDUM OPINION

This disability discrimination case brought by intellectually or physically disabled individuals has settled, (Doc. No. 97) and the Settlement Agreement has been accepted by the Court. (Doc. No. 99). Now before the Court is Plaintiffs' fully briefed Motion for Attorneys' Fees and Costs. (Doc. No. 112, 112-1, 116, 131-1 and 132).

The Court has previously summarized what this case is about.

Plaintiffs range in age from 17 to 41 years old, and each has a severe medical and/or intellectual disability requiring twenty-four hour a day care. That care is provided through the Medicaid Program via TennCare, and by family members. Each Plaintiff has an independent support plan ("ISP") and an independent support coordinator ("ISC") who try to find providers that can meet their specific needs. (Doc. No. 29 at 2).

TennCare provides three categories of services to citizens in this state. The first is basic Medicaid services, which is provided through private Managed Care Organizations ("MCOs"). The second is medically necessary early and periodic screening, diagnostics and treatment ("EPSDT") for those under 21 years old. This, too, is provided by MCOs and covers two of the Plaintiffs in this case. The third, and the one most relevant here, is through waivers from the Centers for Medicare & Medicaid Services ("CMS") that allow states to provide Home and Community Based Services ("HCBS") to individuals who would otherwise receive medical care in an institutional setting, so long as the overall cost is lower. These waivers are administered by the Tennessee Department of Intellectual and Developmental Disabilities and are known as "DIDD Waivers." (Doc. No. 28-1 at 2-3).

1

Plaintiffs allege that, even though Tennessee recognizes they require extensive care "including personal attendant (PA) services to enable them to live safely at home," it has failed to provide the necessary and required "in-home" care required to meet their needs. This has resulted in gaps in care and has caused "preventable suffering, harm to their health and [a] heightened risk of involuntary institutionalization, all in violation of the federal Medicaid Act and its implementing regulations." (Doc. No. 1, Compl. ¶ 2).

With respect to all of the Plaintiffs, the essence of their complaint is as follows:

> The State's chronic failure to meet the Plaintiffs' care needs is due to the State's longstanding insistence on paying lower rates for home care services, including PA services, for people in the DIDD Waiver than TennCare pays for identical services provided to all other TennCare enrollees. The policy has deterred agencies from contracting with TennCare, resulting in a provider network that is grossly inadequate to meet the needs of many DIDD Waiver participants like the Plaintiffs. The State recently improved DIDD'S rates for PA services, but left rates for other DIDD providers well below the rates that the State pays for the care of all other TennCare enrollees. As a result, agencies remain unwilling to contract with DIDD, and the DIDD Waiver remains incapable of meeting the Plaintiffs' needs for PA services. The State's policy discriminates against the Plaintiffs on the basis of their intellectual disabilities in violation of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. The State also violates the ADA by offering the Plaintiffs the care they need in an institutional setting, while withholding care in a home and community-based setting, in defiance of the ADA's requirement that services be provided in the most integrated setting appropriate to the individual's needs.

(Id. ¶ 3). In addition, Plaintiffs M.A.C. and Burk allege that they have not received the medically necessary EPSDT services that they are entitled to as minors. (Id. ¶ 5). Finally, Plaintiffs allege that "[t]he State has compounded the harm . . . by denying them the opportunity to appeal and receive a fair hearing to remedy the wrongful denial of necessary health services." Id. ¶ 4).

The Complaint contains nine causes of action. Plaintiffs claim that the practices about which they complain violate the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

(Doc. No. 37 at 2-3). Plaintiffs requested declaratory relief, preliminary and permanent injunctive relief, and attorneys' fees and costs. (Doc. No. 1 at 39).

Less than a month after the Complaint was filed the Court entered an Agreed Order that caused the Plaintiffs to withdraw their motion for a preliminary injunction. (Doc. No. 19). The Agreed Order addressed Plaintiffs' concerns that the State failed to meet their needs for home services, as alleged in the Complaint. Specifically, the State agreed to provide Plaintiffs with personal assistance services, personal care services, and home health aide services. Indeed, the Agreed Order required meaningful actions by Defendants all directed at improving the delivery of services to Plaintiffs. For example, Defendants agreed to "diligently communicate" and "offer a new referral incentive" for Personal Assistance services, as well as "expedited provider enrollment" for Personal Assistance services. (Doc. No. 19 at 2). Critically, Defendants agreed to "exercise good faith, best efforts to ensuring staffing of all services." (Doc. No. 19 at 4). This ties to Plaintiffs' requested relief to prohibit "the Defendants from withholding medically necessary services" that Plaintiffs alleged violated federal law. (Doc. No. 1 at 39).

The parties then continued their efforts to resolve this case and entered into the Settlement Agreement dated November 4, 2022. (Doc. No. 97). Without admitting any liability and reserving the determination of "prevailing party," the parties directly addressed Plaintiffs' need for medical services, delivery of care, and response time to resolve disputes. The availability of services to Plaintiffs was the heart and soul of their concerns as set forth in the Complaint:

- Count I – (Paragraph 126)
  "The Defendants, acting under color of state law, are not meeting the requirements of Section 1396n(c)(2)(A), as they are not allowing Plaintiffs the opportunity to receive medically necessary <u>services</u> in the community, not optimizing Plaintiffs' independence in making life choices, and not facilitating Plaintiffs' individual choice regarding <u>services</u> and who provides them." (emphasis added)

- Count II – (Paragraph 132)
  "The Defendants, acting under color of state law, fail or refuse to provide Plaintiffs the <u>level of care</u> needed in their home that is prescribed by their approved Individual Support Plan, knowing that they cannot safely remain at home without the prescribed <u>level of care</u>." (emphasis added)

3

- Count III – (Paragraph 138)
  "By failing to contract with sufficient providers to meet the service needs of individuals with intellectual disabilities, including the Plaintiffs, who receive those services through the DIDD Waiver, while offering better terms to providers the same types of services to other TennCare enrollees, the Defendants have violated, and continue to violate, the Plaintiffs' rights under 42 U.S.C. § 12132." (emphasis added)

- Count IV – (Paragraph 146)
  "By historically paying lower rates for services for individuals with intellectual disabilities enrolled in the DIDD Waiver than it has paid for the same care provided to any other TennCare enrollee, Defendants have deterred agencies from contracting with DIDD, resulting in the maintenance of a provider network that is incapable of meeting the care needs of DIDD Waiver enrollees, including the Plaintiffs." (emphasis added)

- Count V – (Paragraph 154)
  "By failing to ensure that the Plaintiffs receive the PA care that TennCare has long determined they need—in their home—Defendants have placed the Plaintiffs at serious risk of forced institutionalization, in violation of the ADA's integration mandate that public services be provided in the most integrated setting appropriate to the needs of a person with a disability." (emphasis added)

- Count VI – (Paragraph 160)
  "By making necessary care available to the Plaintiffs only in an ICF/IID institutional setting, while withholding that same necessary care in their own home and with their own family, the Defendants have violated, and continue to violate, the integration mandate of Section 504 of the Rehabilitation Act. 45 C.F.R. § 84.4(b)(2)." (emphasis added)

- Count VII – (Paragraphs 162 and 163)
  "162. The Medicaid Act, 42 U.S.C. § 1396d(a)(4) and 42 U.S.C. § 1396d(r), requires all state Medicaid programs to provide "early and periodic screening, diagnostic, and treatment services" for children under the age of 21, which includes:
  > necessary health care, diagnostic services, treatment, and other measures described in section 1905(a) [subsec. (a) of this section] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan. 42 U.S.C. § 1396d(r)." (emphasis added)

  "163. Under 42 U.S.C. § 1396d(r)(5), (a)(7), home health care services such as PA are included as a covered service." (emphasis added)

- Count VIII – (Paragraphs 169 and 170)
  "169. The Defendants have systematically failed, and continue to fail, to provide Plaintiffs an opportunity for a fair hearing regarding the delay, denial, or reduction of services in violation of 42 U.S.C. § 1396a(a)(3)." (emphasis added)

4

"170. The requirements of Section 1396a(a)(3) are intended to protect the due process rights of Medicaid recipients, to confer rights on such recipients, and to impose a mandatory duty on the State to maintain a hearing system. This mandatory duty is neither vague nor amorphous; rather, it is an unambiguous directive. The right established under 42 U.S.C. § 1396a(a)(3) is enforceable by Plaintiffs pursuant to 42 U.S.C. § 1983, under which they bring this claim."

- Count IX – (Paragraph 173)
"The Defendants have deprived, and continue to deprive, the Plaintiffs of due process of law in violation of the Fourteenth Amendment by failing to provide a timely opportunity for a fair hearing and effective redress for the wrongful delay, denial, or reduction of medically necessary TennCare <u>services</u> to which the Plaintiffs are entitled." (emphasis added)

Defendants also agreed to allow additional persons, who could benefit from the Settlement Agreement, to join the lawsuit by identifying five individuals who could intervene, without any opposition of Defendants. (Doc. No. 97 at 4). The parties even agreed that, among other things, the State would take "all of the known actions that Defendants have available to ensure that all of the services authorized in Plaintiffs' respective ISPs are provided." (Doc. No. 97 at 2 and Attachment A).

Plaintiffs now seek a revised award of $350,574.00 for reasonable attorneys' fees and mediation fees. (Doc. No. 132-1). They argue that the relief granted in the Agreed Order and Settlement Agreement make them prevailing parties and the requested fees are reasonable. Defendants disagree, arguing that Plaintiffs are not prevailing parties, and, alternatively, if they are prevailing parties, special circumstances prohibit any fee award, or a fee award that is greatly reduced.

Plaintiffs' entitlement to attorneys' fees must be authorized by contract or statute because the American Rule does not otherwise create a right to attorney fees. <u>G.S. v. Lee</u>, 2023 WL 5205179 (6th Cir. 2023) (citing <u>McQueary v. Conway</u>, 614 F.3d 591, 597 (6th Cir. 2010)). Here, Plaintiff relies upon the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., the

5

Rehabilitation Act, 29 U.S.C. § 701 et seq. and 42 U.S.C.§§ 1983 and 1988(b) that each authorize an award of attorneys fees to the prevailing party. Recently, the Sixth Circuit noted that the Supreme Court's decisions in Buckhannon Bd. & Care Home, Inc., v. W. Va. Dep't of Health & Human Res., 532 U.S. 598 (2001) and Sole v. Wyner, 551 U.S. 74 (2007) along with Sixth Circuit precedent, McQueary v. Conway, 614 F.3d at 597-598 and Planned Parenthood SW. Ohio Region v. Dewine, 931 F.3d 530, 541 (6th Cir. 2019), "give shape" to the prevailing party status inquiry. G.S.v. Lee, 2023 WL 5205179 at 3. Sole teaches that "the touchstone of the . . . inquiry . . . is the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." 551 U.S. at 82.

"A party achieves a material alteration when it 'succeeds on any significant issue in litigation which achieves some of the benefit the party sought in bringing the suit.'" (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). Sole clarified that the material alteration must be enduring. 551 U.S. at 82, 86. "To be considered enduring, a change must not be reversed, dissolved or otherwise redone by the final decision in the same case." G.S. v. Lee, 2023 WL 5205179 at 3 (citing McQueary and quoting Sole). Prevailing party status does not attach, however, if the lawsuit is merely the catalyst to change the defendant's behavior, Buckhannon Bd. & Care Homes, Inc., 532 U.S. at 605, or if the plaintiff's success is not based, in part, on the merits of the claim. Dewine, 931 at 539.

The Agreed Order and the Settlement Agreement materially altered the relationship between the parties. First, as explained, both created agreed obligations and responsibilities on Defendants offering of services for Plaintiffs. Second, the Settlement Agreement creates mutual reporting obligations by notifying when there is a failure to provide certain types of services. Third, the Settlement Agreement created a process to resolve violations of the Settlement

6

Agreement by any other administrative rights available to Plaintiffs. Fourth, the parties' battle over metrics attempting to quantify whether the Agreed Order and Settlement Agreement objectively provided material relief has been considered by the Court. Ultimately, the offered metrics are of little value because other than verifying authenticity of the metrics, (Doc. No. 116-2), they offer no reasoned explanation on how the metrics were analyzed to reach their respective conclusions. Taken together, the Agreed Order and Settlement Agreement addressed the provision of services to home-bound individuals and by doing so, each solidified, clarified and itemized how those services would be delivered to Plaintiffs.

Nonetheless, Defendants argue that Plaintiffs are not prevailing parties because the Agreed Order and Settlement Agreement are not enduring because they fail to provide permanent declaratory or injunctive relief as sought in the Complaint. In support of their position, Defendants argue that the Settlement Agreement only has a 13-month life cycle, which is not permanent relief. These arguments overlook G.S. v. Lee.

In G.S. v. Lee, the Sixth Circuit explained, in the context of injunctive relief, that the "magnitude" of Plaintiff's relief does not control, the prevailing plaintiff status that attaches even when the Plaintiff does not obtain the "primary relief." 2023 WL 5205179 at 4-5. Here, Plaintiffs obtained enduring relief that is tied to the merits of their claim for services. True, they did not obtain preliminary or permanent injunctive relief as such, but this is not legally required, G.S. v. Bill Lee, 2023 WL 5205179 at 5, and they did obtain a Court order on the delivery of healthcare services to Plaintiffs. The Agreed Order has not been vacated and the Settlement Agreement does not do so, so it continues to be in effect addressing the delivery of services. Further, even if the Agreed Order was not effective, the Settlement Agreement was approved and accepted in an Order (Doc. No. 99) and provides the same relief. During the 13-month life of the Settlement Agreement

7

Plaintiffs have the opportunity to pursue healthcare services. That is enough to cross the prevailing plaintiff finish line.

A prevailing party is entitled to an award of reasonable attorneys' fees and costs "unless special circumstances would render such an award unjust." Hensley, 461 U.S. at 429 (internal quotation marks omitted). Defendants argue that the actions of Plaintiffs' families constitute special circumstances, because they are responsible for the alleged lapses in Plaintiffs' in-home care services. (Doc. No. 131-1 at 15–20). Defendants' declarations and deposition transcripts from caregivers provide their subjective personal complaints about what Plaintiffs' families did to them. Those complaints range from families being unkind, intimidating and manipulative; to being forced to work in homes in 80 plus degree temperatures; to not being allowed to use the family Wi-Fi; to rejecting over 100 prospective caregivers; and to being belittled for wearing masks during the height of Covid-19. (Doc. No. 131-1 at 11-17). According to Defendants, Plaintiffs' families caused the servicing issues, rendering Plaintiffs' claims meritless. This leads Defendants to label the resolution of this case as a "nuisance settlement," which cannot support an award of fees.

The Court disagrees. The Defendants' allegations of Plaintiffs' families' misbehavior does not constitute "special circumstances" to justify a fee award of zero. First, Defendants make no argument that the amount of attorneys' fees sought includes work due to Plaintiffs' families' alleged misbehavior. Second, Sixth Circuit precedent has consistently rejected the proposition that a prevailing plaintiff's bad acts constitute "special circumstances." Murphy v. Vaive Wood Products Company, 802 Fed. App'x 930, 934 (6th Cir. 2020) (Plaintiff's dishonesty at her deposition did not bar her attorney from receiving attorneys' fees); Wikol v. Birmingham Pub. Schs. Bd. of Educ., 360 F.3d 604, 611 (6th Cir. 2004) (Plaintiffs alleged false and misleading

billings do not bar an award of attorneys' fees); Price v. Pelka, 690 F.2d 98, 101 (6th Cir. 1982) (Plaintiff's perjury did not warrant denial of attorneys' fees). Third, Plaintiffs' families' alleged misbehavior that caused staffing service problems goes to the merits of Plaintiffs' claim, not to Plaintiffs' attorneys' fees motion. Fourth, Defendants cite the following passage from Nored v. Tenn. Dep't of Intell. R. Devel. Disabs., 2022 WL 4115962 at *9-10 (6th Cir. 2022) in support of their special circumstances argument to deny Plaintiffs' attorneys' fees completely: "[N]on-negotiable conditions created by the parents of an intellectually disabled TennCare enrollee were to blame for his staffing issues." Nored has nothing to do with awarding attorneys' fees. In fact, the words attorneys' fees is never used in the opinion. Defendants' slight of hand is perplexing.

A reasonable attorney fee is calculated by the lodestar method. See Blum v. Stenson, 465 U.S. 886, 888 (1984); "Ne." Ohio Coal. for the Homeless v. Husted, 831 F.3d 686, 702 (6th Cir. 2016). The lodestar is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley, 461 U.S. at 433. Having reviewed the itemization of each attorneys' declaration of experience and work on the case, (Doc. Nos. 105, 106, 107, 108, 109, 110 and 111), and the declaration of other healthcare litigators, (Doc. Nos. 102, 103 and 104), the Court finds the revised request reasonable. Their hourly rates are reasonable and are not uncontested. Indeed, they are "below market rates charged by attorneys of comparable experience" in healthcare litigation. (Doc. No. 102 at 3; see Doc. Nos. 103 at 2; 104 at 2). The case was handled at the appropriate levels of experience, there is no duplication of work, and the itemization is appropriate. In fact, the requested award reflects an overall 10% reduction. (Doc. No. 112-1 at 15). Additionally, the Court also finds the Plaintiffs' share of the costs for mediation, which immediately precipitated the settlement is reasonable.

9

Defendants argue that the fee award should be reduced by 20% to reflect the dismissal of Jay Bryant, to exclude work performed on behalf of intervenors, and ultimately be reduced by an additional 95% given the "meager" relief granted. (Doc. No. 131-1 at 14, 22–26). None of these arguments warrant a reduction. The Court's decision to approve the requested revised amount of $350,574.00 (Doc. No. 132-1) reflects the Plaintiffs' voluntary reduction for work for Jay Bryant, the Olin brothers and unfiled motions. The attorney fees for intervenors is appropriate as well because the Defendants did not oppose their entry into the case. They are prevailing parties like other Plaintiffs because they benefitted from the Agreed Order and Settlement Agreement. For the reasons stated there is no reason for a 95% overall reduction.

For the foregoing reasons, the Motion for Attorneys' Fees and Costs will be granted, and Plaintiffs' will be awarded the revised requested amount.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE